IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL CODER,

                Plaintiff,          OPINION AND ORDER

v.

                                        21-cv-109-wmc

DEPUTY CHRISTOPHER GIESE,
DEPUTY MICHAEL PAPARA and
DEPUTY BLAKE ZIBELL,

                Defendants.

*Pro se* plaintiff Michael Coder was confined at the Sauk County Jail in May of 2020, where deputies used force to remove him from his cell and to conduct a strip search based on his suspected possession of contraband. Specifically, the defendants involved -- Deputies Christopher Giese, Michael Papara and Blake Zibell -- physically restrained, employed knee strikes against, and tased Coder in the process of restraining and searching him. The court granted Coder leave to proceed against the defendants on Fourteenth Amendment excessive force claims, and now before the court is defendants' motion for summary judgment. (Dkt. #34.) For reasons explained below, the court finds that defendant Papara is entitled to summary judgment on the claim against him, but factual disputes preclude summary judgment as to the other defendants' uses of a taser, alleged compliance hold, and knee strikes. Accordingly, the court will grant defendants' motion for summary judgment in part, deny it in part and the remaining claims will proceed to trial.

UNDISPUTED FACTS[1]

In May of 2020, defendants Giese, Papara and Zibell were each employed as Sheriff's Deputies at the Sauk County Jail. On or around May 22, Coder was arrested on multiple charges related to operating a motor vehicle while intoxicated and taken into custody at the jail. While Coder was awaiting an initial appearance, he was housed in cell D159 at the jail.

A non-defendant, Sergeant Hamer, reported receiving information that Coder was known for bringing drug contraband into the jail, which prompted him to review video footage of Coder's receiving cell. Hamer further reported seeing Coder on the video pulling something out of his waistband and placing it under his mattress, then later reaching under his mattress several times for what appeared to be a dark-colored baggie.[2]

Next, Sergeant Hamer told defendants Giese and Zibell that Coder seemed to be placing and removing an object from his sock, and at about 6:00 p.m. on the evening of May 23, Deputy Giese searched Coder's cell. After finding no contraband, Giese concluded

---

[1] Unless otherwise noted, the following facts are material and undisputed based on the parties' summary judgment submissions. Specifically here, although plaintiff Coder fails to cite any specific evidence in responding to defendants' proposed findings of fact, he did sign the response itself under penalty of perjury. (Dkt. #57, at 25.) Accordingly, the court will accept as evidence Coder's factual responses to the extent they could have been reasonably drawn from his personal knowledge. *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible."). Moreover, except as referred to below, there is limited video of the relevant interactions between defendants and Coder, making many of the material facts open to dispute and interpretation.

[2] Coder disputes possessing a dark colored baggie in his cell, but not the sergeant's report about his observations, so this proposed fact is undisputed as to what the named defendants were told.

that a strip search was necessary, telling defendant Zibell that he believed Coder had a bag of drugs in one of his socks.

Deputies Giese and Zibell also spoke with Coder at his cell, although the parties dispute how their interaction played out. Giese and Zibell each attest that Giese instructed Coder to sit on his mattress three, separate times before Coder would comply, while Coder attests that he complied with Giese's first request. Giese then told Coder that they would be walking Coder to the changeover room to conduct a strip search because he believed Coder possessed contraband, and Zibell and Giese escorted Coder to the changeover room without incident. Once there, Giese directed Coder to step inside the first shower stall, and Coder again complied. Coder began to undress while Giese explained the strip search procedure to him. Coder removed his shirt, pants and right sock and handed them to Giese. When Coder removed his left sock, he rolled it inside out and handed it to Giese.

At the same time, however, Coder held an item in his left hand, while attempting to hide that item from Deputies Giese and Zibell. After observing Coder trying to hide an item that appeared to be a plastic baggie or glove, Giese yelled, "He has something in his hand!" (Zibell Decl. (dkt. #45) ¶ 4.) Giese then grabbed Coder's left hand as Coder placed the suspected baggie inside his underpants. According to Giese, when he grabbed his hand, Coder tensed his left arm muscles, so he directed Coder to stop resisting and radioed for assistance in the changeover room. At that point, Zibell entered the room and also directed Coder to stop resisting Giese. Finally, Hamer entered the room and observed Zibell and Giese giving Coder commands to stop resisting and to open his hand.

At that point, Zibell attests that he next displayed his taser and warned Coder that if he continued to resist, he would deploy the taser. While Coder maintains that Zibell never warned him that he would use the taser, it is undisputed that Coder then pushed forward towards the deputies, which prompted Zibell to deploy the taser to Coder's middle abdomen area. Coder claims that the taser caused him to go to the ground, where he no longer resisted, while Giese and Zibell attest that the taser deployed ineffectively, and Coder continued to resist actively by pulling away from Zibell and Giese, which caused Giese to take Coder to the ground.

Giese says that Coder then attempted to grab Zibell's taser multiple times, and Zibell says that Coder was able to get a hand on the taser and tried to pull it away from him. Again, in contrast, Coder disputes trying to grab or grabbing the taser from Zibell, but it is undisputed that Giese and Zibell next deployed knee strikes on Coder and when he was on the ground, Zibell placed the taser on Coder's lower back and kept his hand on the trigger until Coder stopped resisting. Zibell maintains that he did not deploy the taser for a second time, while Coder contends that he was tased on his back even though he was by then on the ground and not resisting.

Giese also attests that Coder continued to resist while he was placing the handcuffs. After Coder was handcuffed, Giese and Zibell then helped Coder to his feet and walked him to a restraint chair. Giese maintains that Coder continued to resist his attempts to place Coder in the restraint chair, and he required the help of three, additional deputies. Immediately after Coder was secured in the chair, Zibell attests that Coder still attempted to get up, and as Zibell tried to hold Coder's head back, he pushed forward with such force

4

that Zibell had to resort to placing his fingers under Coder's chin and push on Coder's pressure point until he finally stopped resisting. Again, in direct contradiction, Coder says that he remained in his chair, and Zibell's hold caused him unnecessary pain.

As the officers wheeled Coder to the booking area, Zibell attest that Coder attempted to get his hands down the back of his underpants, prompting Zibell to remove the handcuffs and the place Coder's hands into wrist restraints on the restraint chair with the help of other officers.

Once in the booking area, the on-call jail nurse attempted to assess Coder. However, Giese and Zibell both attest that she could not do so because Coder actively refused and slipped out of one of his shoulder restraints, which Coder disputes as well. Although video footage was maintained from the booking area, Coder is obstructed from view for the most part, so it is difficult to discern whether or how Coder was resisting the officers, or whether Coder freed himself from the shoulder strap, and the footage does not contain audio. (*See* Exs T, U.) Further, while Giese attests that multiple deputies directed Coder to stop resisting, at which point he displayed his taser without the cartridge and directed Coder to stop resisting or he would tase him. On the other hand, Coder maintains that: he was still not resisting; he heard no officer direct him to stop resisting; and Giese gave him no warning before administering the taser. Regardless, Giese performed a "drive stun," placing the taser directly on Coder's abdomen area for five seconds. Geise maintains that only after doing so did Coder finally stop resisting.

After resecuring Coder in the restraint chair, the officers took Coder to a cell. Zibell also asked Coder if he was injured, and when Coder responded "everywhere," Zibell offered

5

an opportunity to see the on-duty nurse, but Coder refused. Moreover, while an officer attempted to take his blood pressure, Coder attempted to bite him.

At around 8:00 p.m. that evening, a nurse was able to check on Coder, but said that he was too worked up to get good vitals, so the deputies should try again once Coder was more compliant. The nurse also observed that Coder was clearly under the influence of some type of drug and appeared *more* intoxicated than when she had seen him earlier that day.

About 45 minutes later, the deputies returned to Coder's cell to check his restraints and attempt to remove contraband from him. After removing all but his ankle restraints, the deputies attest that Coder would not follow commands and refused to stand up from the chair, which Coder says was due to the ankle restraints. Zibell then grabbed Coder's arm and attempted to help him stand, but Coder resisted, trying to sit back in the chair and pulling away from Zibell. For his part, Coder says that he had simply lost his balance, but he does not dispute that when multiple officers attempted to place him in the restraint chair, he continued to resist and pull away. This prompted Giese to put Coder in a compliance hold, placing his fingers under Coder's chin and applying pressure, which Coder maintains Giese knew would cause him pain. As Coder was being placed back in the chair, he told Giese, "I'm going to kill you, I'm gonna find you on the streets and kill you when I get out of here." (Giese Decl. (dkt. #43) ¶ 4.) Coder does not dispute threatening Giese, and there is video footage showing an altercation between Coder and the officers from above. (*See* Ex. V.) Unfortunately, this video is also open to

6

interpretation as to whether Coder was falling back in the chair or if he was purposely attempting to pull away from the officers.

About two hours later, Zibell and Giese again attempted to search Coder's underpants with additional deputies assisting, including defendant Papara. After Zibell placed a spit hood on Coder's face because he had previously attempted to bite a deputy, Papara cut Coder's underwear from the waistband to the leg of the left side, then made the same cut on the right side, after which he attempted to remove Coder's underwear. Papara attests that Coder then tried to reach between his legs and squeezed his thighs together to prevent removal of the underwear, while Coder disputes resisting, stating that he was fully strapped into the restraint chair. Finally, the video footage from the cell appears to show Papara pulling the underwear and Coder pressing his legs together. (*See* Ex. W, at 3:25-3:36.)

Regardless, Papara eventually was able to remove Coder's underwear, at which point Papara and Giese observed a small baggie between Coder's legs, which Giese attests he saw. According to Giese, he removed the baggie without touching Coder, while Coder maintains that Giese lifted his testicles, reached between his legs, and pulled a baggie from his rectum, causing his rectum to bleed. Although the footage shows the officers moving Coder's legs, the deputies' backs obstruct view of Coder (*see id.*, at 3:54-4:15), so it remains disputed exactly how Giese retrieved the bag. After removing the bag, Giese took it to the evidence room. The substance in the baggie tested positive for heroin.

On July 10, 2020, Coder submitted a written grievance complaining that Giese should not be around him when he was involved in a case against him. On July 12, a

sergeant denied Coder's grievance. Coder appealed that denial, which was also denied because Coder had not raised any reason Giese should not work near him, other than Coder's own discomfort. In January 2021, Coder drafted four more grievances alleging that excessive force had been used against him during the May 23, 2020, incident. On January 14, 2021, Coder's grievances were denied as untimely, having been submitted well after the grievance deadline set forth in the jail's policies. Coder appealed, and on January 25, the sheriff affirmed the denial, both because it was untimely and because, on the merits, the use of force was appropriate, given: (1) Coder had been attempting to hide contraband that was later identified as heroin; and (2) he had been resistive to the point that staff could not restrain him. (*See* dkt. #48-15.)

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Defendants seek summary judgment on three grounds: (1) Coder failed to exhaust his administrative remedies; (2) Coder's claims fail on the merits; and (3) qualified immunity precludes Coder from obtaining monetary damages. The court takes up each of these grounds in that same order.

I. **Exhaustion**

Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought . . . under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Generally, a prisoner must "properly take each step within the administrative process" to comply with § 1997e(a). *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). This includes following instructions for filing the initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), *and* filing all necessary appeals "in the place, and at the time, the prison's administrative rules require," *Pozo*, 286 F.3d at 1025. Failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense that must be proven by the defendants. *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).

Defendants concede that they failed to raise this defense by the deadline set by the court but ask that this be excused in the interest of justice. Although the court will take up defendants' affirmative defense now, it still fails. Specifically, defendants now contend that Coder's failed to exhaust his administrative remedies because his excessive force grievances were filed untimely. While correct that Coder's grievances were untimely, defendants ignore the fact that the sheriff did not deny Coder's appeal of his denied grievances on that ground alone. Rather, the sheriff went on to address these grievances

9

on their merits, finding that after reviewing the video footage of the incidents and the force used, that his excessive force claims lacked merit. "Where prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011). Accordingly, defendants are not entitled to summary judgment based on Coder's failure to exhaust his administrative remedies, and the court will proceed to the merits of his excessive force claims.

## II.     Merits

Though not materially different in most instances, the starting point is determining the applicable constitutional standard for plaintiff's excessive force claims. At the screening stage, the court assumed that Coder was a pretrial detainee, and thus, his claims fall under the Fourteenth Amendment's due process clause. Having fleshed out the record at summary judgment, Coder appears to have been arrested on May 22, and on May 23 was still awaiting his initial appearance on drug-related charges. Since the Fourth Amendment governs claims of arrestees up until the point of a judicial determination of probable cause, *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017), the court must address Coder's claims under that standard.

To succeed on an excessive force claim under the Fourth Amendment, a plaintiff must demonstrate that the use of force was objectively unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Thompson v. City of Chicago*,

472 F.3d 444, 454 (7th Cir. 2006). Moreover, courts must evaluate the objective reasonableness of an officer's action not through "the 20/20 vision of hindsight," but from "the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. More specifically, among the factors for consideration at that time are the need for the use of force, the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any efforts made to temper or limit the amount of force, the threat reasonably perceived by the officers, and whether the plaintiff was actively resisting. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009).

Here, Coder's claims against defendants arise from the force used when: (a) Deputies Zibell and Giese first took Coder to the ground, using strikes and a taser, allegedly twice, and placed him in the restraint chair; (b) Deputy Giese used the taser in the booking area; (c) Deputy Giese used a compliance hold in Coder's cell; and (d) Deputy Papara removed Coder's underwear and the baggie between his legs.

### A. Uses of force when taking Coder to the ground and placing in restraint chair

Up until Zibell tased Coder, Coder does not dispute that he was resisting Zibell's and Giese's directives. Because Coder first challenges Zibell's initial use of the taser, the court begins there. An officer may not use aggressive force or a taser "against a nonresisting or passively resisting subject." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018); *Abbot v. Sangamon Cnty., Ill.*, 705 F.3d 706, 727 (7th Cir. 2013). "In cases upholding the use of Taser guns [in the prison context], the recipients have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others.

11

Such behavior certainly increases the need for force and often poses a threat to the security officers." *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009).

Defendants maintain that when Zibell administered the taser, there was good grounds to believe Coder was in possession of contraband, Coder had previously resisted Giese's instructions, and he was presently resisting the escort hold. Plus, although Zibell warned Coder that he would use the taser, Coder continued to resist. Defendants also point out that Coder had attempted to grab the taser from Zibell multiple times after the taser had been deployed. Further, although Coder disputes whether Zibell warned him that he would use the taser against him if he did not comply, defendants argue that Zibell's use of the taser was reasonable given all the circumstances.

Indeed, not only had Coder been suspected of holding onto and attempting to hide contraband, he concedes actively resisting up until the point that Zibell deployed the taser. Moreover, just before Zibell administered the taser, Coder pushed forward towards the deputies. At that moment, when the officers were dealing with an arrestee they suspected possessed contraband, and who could not be adequately controlled, Coder "posed an immediate threat to safety and order within the jail." *Forrest v. Pine*, 620 F.3d 739, 745 (7th Cir. 2010). Coder would point out in opposition that he did not hear Zibell's warning about the taser, but there is no dispute that the deputies had been instructing him to stop resisting up to the point that Zibell used the taser. So, even if Zibell failed to warn Coder explicitly about the taser, there is no question that he was engaging in dangerous behavior by refusing to comply with the deputies' directives, and Zibell's decision to escalate the force to gain Coder's compliance was appropriate.

In opposition, Coder cites to: (1) a case that did not turn on the use of a taser, *Harris v. Karna*, No. 21-cv-133-jdp, 2022 WL 17039186, at *5-6 (W.D. Wis. Nov. 17, 2022); and (2) a case in which the video evidence indicated that at the time the taser was used, the plaintiff was almost completely still and under officer control, *Berg v. Schultz*, No. 20-cv-185-jdp, 2021 WL 4282525, at *4 (W.D. Wis. Sept. 21, 2021). However, because Coder does not dispute that he *was* resisting when Zibell used the taser, both decisions are readily distinguishable from the circumstances that Zibell was facing when he encountered Coder. Accordingly, Zibell's first use of the taser under those circumstances was reasonable and he is entitled to summary judgment as to this encounter.

Although Zibell is entitled to summary judgment for the first use of the taser, and Coder does not dispute resisting up until that point, Coder further contends that the taser took him to the ground and he was no longer resisting, but defendants Giese and Zibell kneed him multiple times and then Zibell tased him for a second time. In addition, as Coder was being placed in the restraint chair Zibell painfully held his head back. Giese and Zibell maintain that the taser did not take him to the ground, Coder was still resisting, and in fact that Coder attempted to grab the taser from Zibell's hand multiple times, which justified taking Coder to the ground, the knee strikes and Zibell's use of a compliance hold.

As to this part of the altercation, Coder's reference to *Berg* as to the force used once Coder was on the ground and being placed in the restraint chair are persuasive. If a jury were to believe Coder that he was no longer resisting after Zibell tased him, it could find that Zibell and Giese used unreasonable force when they deployed the knee strikes, and that Zibell used unreasonable force in tasing Coder a second time and putting him a

13

compliance hold. Therefore, Zibell and Giese are not entitled to summary judgment for their conduct after Zibell's appropriate use of the taser.

### B.     Use of the taser once Coder was in restraint chair

Defendants further contend that Giese is entitled to summary judgment for administering the taser when Coder was in the restraint chair because Coder continued to resist the deputies' efforts to secure and search him. Indeed, Giese contends that he only administered the taser on Coder after he repeatedly warned Coder that he would tase him, that Coder had free himself of the shoulder strap and that Coder refused to stop resisting. That Zibell's initial use of force was "justified does not mean that all subsequent uses of force were similarly justified"; the "totality of the circumstance, not the first forcible act . . . determines objective reasonableness." *Abbot*, 705 F.3d at 729. Coder certainly had been resisting the deputies' initial efforts to restrain him, but according to Coder, once he was in the restraint chair he was secure and compliant. Although defendants maintain that Coder had freed himself of the shoulder straps, Coder contends not only that his shoulder strap had not fallen off but also that he was compliant when Giese tased him without warning. If Coder was, in fact, compliant at that point, Giese's use of the taser would have been unreasonable. Because of this factual dispute, a jury will have to determine whether Giese's use of the taser was unreasonable.

### C.     Giese's compliance hold in the cell

Still, Giese is entitled to summary judgment for his use of a compliance hold about 45 minutes later. At that point, Coder was in a cell and deputies released him from all

restraints except for those on his ankles so that the deputies could search him for contraband. When Coder did not rise from his restraint chair as directed and pulled against the deputies trying to lift Coder out of the chair to search him, Giese pulled Coder's chin back and upwards, which Coder contends caused him severe pain.

Giese maintains that this compliance hold was reasonable because Coder was resisting by refusing to stand up as directed and pulling away from the deputies. Although Coder contends in opposition that he had lost his balance and he was not *actually* resisting, Coder's subjective intent does not impact the use of force analysis. *See Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (in circumstance in which plaintiff was experiencing diabetic shock, officer could reasonably misconstrue the plaintiff's unresponsiveness -- as resistance, justifying the minimal use of force); *Matt v. City of Green Bay*, No. 21-C-439, 2022 WL 1063724 (E.D. Wis. April 8, 2022) (officer's hand-strike was objectively unreasonable even though plaintiff did not intentionally kick the officer because officer reasonably believed that the plaintiff posed a threat).

Instead, the relevant question is what a reasonable officer would have observed at that point. Here, it is undisputed that Coder did not stand as directed, and the video footage establishes that Coder pulled himself down and back into the chair when the deputies were trying to lift him to stand for inspection. (*See* Ex. V, at 2:00-2:40.) The footage further shows the deputies struggling to move Coder back into a seated position on the restraint chair, and there is no question that Coder is leaning forward and away from the chair, which prompts Giese to pull back Coder's chin. (*Id.* at 2:40-3:00.) Thus, there is no reasonable question that Coder was unrestrained and noncompliant, and his

head was leaning forward, making it objectively reasonable and necessary for Giese to regain compliance by pulling back on Coder's chin. Giese then held Coder's chin in that position for almost three minutes, which was the time it took the other deputies to resecure Coder's wrists and shoulders to the restraint chair and to put pads in place around the restraint chair. (*Id.* at 2:40-5:20.) During that period, Coder is again seen to be struggling against the deputies and moving his chin, indicating that Coder was not fully compliant at any point up until the deputies finished resecuring him.

Throughout that encounter, a reasonable jury would have to find that an objective officer would perceive Coder as presenting a safety risk, both to himself and to the other deputies. Indeed, by then, Coder had been suspected of recent drug use; a nurse commented that his intoxication seemed to have increased; and he had already been physically resisting efforts to control him. When the deputies' second attempt to search him failed, it was also objectively reasonable for Giese to use the compliance hold on Coder's chin for the time it took to resecure him. In fact, that measure appeared necessary, given that Coder appears on the video to continue to press against his restraints and move his chin away from Giese. Therefore, Giese is entitled to summary judgment as to his use of the compliance hold at 8:45 p.m. A jury must address (1) Giese's use of knee strikes after taking Coder to the ground, and (2) Giese's use of the taser that evening at about 7:00 p.m.

### D. Papara

Finally, Papara is entitled to summary judgment because it is undisputed that his involvement was limited to cutting off Coder's underwear to locate the suspected drugs.

16

Although Coder alleged in his complaint that Papara pulled a baggie from his anus, it is now clear that Papara's only involvement was cutting Coder's underwear and pulling them from Coder's body, and that Giese pulled the baggie out from between Coder's legs.[3]  On this record, Papara is entitled to summary judgment.  When Coder resisted Papara's effort to remove his underwear by pressing his thighs together, Papara held onto the underwear and then was assisted by Zibell, and the two of them pulled the underwear out.  It is clear from the video footage that Coder was resisting Papara's reasonable efforts to conduct the contraband search; Papara's use of force was minimal, limited to just pulling the already-cut underwear.  No reasonable factfinder could conclude that Papara used more force than necessary to remove Coder's underwear.  Therefore, Papara is entitled to summary judgment.

## III. Qualified Immunity

As for defendants' alternative qualified immunity argument, the same factual disputes related to Zibell's and Giese's use of knee strikes, Zibell's alleged second use of the taser and compliance hold, and Giese's use of the taser preclude a finding of qualified immunity at this stage.  *See Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022)

---

[3] Coder did not seek leave of court to amend his complaint to include an allegation that Giese used excessive force in removing the baggie from his rectum.  Nor does Coder explain his failure to bring up this new allegation against Giese until now, and Coder may not insert a new factual basis to pursue an excessive force claim against Giese in his summary judgment opposition materials.  *See Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 813-14(7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion.") (citation omitted).  Accordingly, the court will not read this claim against Giese into his complaint at this late stage.

(dismissing interlocutory appeal of denial of qualified immunity because factual disputes precluded district court from determining whether defendant violated clearly established law). Although defendants may reassert the qualified immunity defense at the close of Coder's case and close of the evidence, it appears that a jury must decide whether defendants' use of force was objectively unreasonable under current law.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #34) is DENIED in part as to (1) Zibell's and Giese's use of knee strikes, (2) Zibell's alleged second use of the taser and compliance hold, and (3) Giese's use of the taser; and GRANTED in part as to defendant Papara and as to all other, remaining claimed uses of force by Zibell and Giese.

2) At the close of this case, the clerk of court is directed to enter judgement in Papara's favor.

3) The court will issue a trial preparation order that sets further deadlines and explains trial logistics.

Entered this 20th day of July, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge