IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL CODER,

                Plaintiff,

   v.

DEPUTY CHRISTOPHER GIESE,
DEPUTY PAPARA,
and DEPUTY ZIBELL

                Defendants.

OPINION AND ORDER

Case No. 21-cv-109-wmc

---

     While confined at the Sauk County Jail, plaintiff Michael Coder alleges that Deputies Blake Zibell and Christopher Giese used excessive force in searching and restraining him. Still representing himself, the court granted Coder leave to proceed against defendants on Fourteenth Amendment excessive force claims. A jury trial followed that resulted in a split verdict: the jury unanimously found Zibell not liable for excessive force, but was unable to reach a unanimous verdict as to Giese. Defendants subsequently moved for entry of final judgment consistent with the partial jury verdict in Zibell's favor and as a matter of law in Giese's favor. Alternatively, defendants move for judgment as a matter of law to both defendants. (Dkt. #135.) Now for the first time through counsel, Coder argues in opposition that the challenged uses of force by defendants are too intertwined for the court to accept a partial verdict. (Dkt. #138.) Instead, Coder requests a new trial on all challenged uses of force applied by both defendants Zibell and Giese. For the reasons explained below, the court will accept the partial verdict finding Zibell not liable. As for Giese, the court will order a new trial on his challenged uses of force.

BACKGROUND

On February 16, 2021, Coder filed a complaint against both Deputuies Zibell and Giese, and another deputy, Papara, alleging that they each used excessive force against him during a strip search at the Sauk County Jail. (Dkt. #1.) The court granted summary judgment on Coder's claim against Papara, and his remaining claims against Zibell and Giese proceeded to trial to challenge five, specific uses of force: (1) Zibell's use of knee strikes; (2) Giese's use of knee strikes; (3) Zibell's use of a taser; (4) Zibell's use of a compliance hold while Coder was in a restraint chair; and (5) Giese's use of a taser while Coder was in a restraint chair. (Def.'s Br. Supp. 12; Pl's Br. Opp'n 15.)

At trial, Coder offered his version of the story through his testimony. Coder acknowledged that he had contraband in his rectum when Giese entered his cell, approached him and grabbed his arm in a "harsh way," which caused him to tense up. (*Id.* 83:16-21; 84:1-5.) Then, Zibell entered the cell, pushed Coder against a wall, and tased Coder in the stomach, causing his knees to shake. (*Id.* 84:6-11.) Next, Giese brought Coder to the ground. (*Id.* 84:11-13.) With Coder face down on the ground and with other guards in the room, Zibell and Giese physically "tussl[ed]" with Coder before Zibell tased him in his back for approximately five seconds. (*Id.* 83:15-19; 84:20-24.) At that point, Coder was handcuffed, escorted to a restraint chair, uncuffed, placed in the chair's restraints, and moved into a booking area. (*Id.* 85:10-25.) While Coder was in the restraint chair, Zibell also placed Coder in a pain compliance hold by grabbing his jaw and head. (*Id.* 86:1-7; 94:4-6.) Coder admitted trying to "wiggle out" of that hold and shaking his head to "soothe" the pain. (*Id.* 86:5-7; 90:18-21.) Giese then tased Coder again in the

stomach for what he testified "seemed like eternity," causing Coder's body to shake uncontrollably. (*Id.* 86:21-25; 94:18-21.) Coder was then taken to a padded cell where contraband was removed, but no more uses of force are alleged or claimed at that point.

Zibell and Giese offered a different version. Both testified that they were sent to Coder's cell to search for contraband. (*Id.* 7:14-22.) After initiating a strip search, Giese noticed a small bag in Coder's hand. (*Id.* 10:2-8.) When Coder put his hand behind his back, Giese grabbed Coder's wrist as Zibell entered the cell. (*Id.* 10:16-24.) However, when Giese tried to handcuff Coder, he pushed Giese's hand away, pulled away, and thrashed with his shoulder. (*Id.* 11:5-24.) Zibell then drew his taser, issued a warning to stop resisting, and, when Coder did not comply, Zibell deployed the taser into Coder's lower abdomen. (*Id.* 12:5-10.)

Because Zibell was so close to Coder when he deployed the taser, he explained the tase caused pain but did not incapacitate Coder. (*Id.* 12:5-13:7.) Giese then directed Coder to the ground while holding his left arm. (*Id.* 13:10-17.) As he was going to the ground, Zibell testified that Coder reached for his taser, prompting Zibell to deploy knee strikes once on the ground. (*Id.* 13:18-22, 13:13-14:2.) At that point, Giese also climbed over Coder and deployed knee strikes, causing Coder to release the taser. (*Id.* 14:3-8.) Because Coder continued resisting being placed in handcuffs, Zibell next tased him in the lower back and directed Coder to stop resisting. (*Id.* 14:22-25.) When Coder still resisted, Zibell tased him again, this time incapacitating him. (*Id.* 15:4-15.) Coder was placed in handcuffs, brought to his feet, and placed in a restraint chair after a little bit of a struggle. (*Id.* 18:9-19; 20:20-25.)

3

After Coder was then moved to a booking area, the deputies noticed that the straps on the restraint chair were loose, and as a result, that Coder was not fully restrained. (*Id.* 20:15-17; 21:19-22:6; 24:9-24.) Although the deputies attempted to tighten the straps, Coder would lean forward or arch his back to prevent them from doing so. (*Id.* 22:19-25; 23:11-23.) This prompted Zibell to apply the compliance hold, but even then, Coder would not sit back all the way. (*Id.* 26:3-10.) Coder also did not heed Giese's warning that he would deploy his taser if he did not stop resisting, and when Coder would not, Giese drew his taser and deployed a five-second, drive stun into Coder's abdomen area, which pushed Coder back into the restraint chair. (*Id.* 23:11-23.) At that point, the deputies were able to adjust the straps.

After lengthy deliberations, the jury sent a note indicating that they were hung on their verdict. (*Id.* 37:7-11.) The court provided a "dynamite instruction," informing the jury that they had a duty to deliberate in an effort to reach a unanimous verdict, and instructed them to continue deliberating. (*Id.* 39:2-9, 20-22.) After further deliberations, the jury had reached a verdict that Zibell did not use excessive force, but they remained split as to Giese. (*Id.* 40:12-24; 42:1-8.) The court polled each juror and confirmed their verdict in favor of Zibell was unanimous. (*Id.* 44:12-14; 44:20-45:11.) The court also confirmed with the foreperson that the jury could not agree as to Giese's liability. (*Id.* 5:14-46:2.) The court then excused the jury. (*Id.* 46:20.)

## OPINION

The court addresses the viability of the claims against each defendant in turn.

4

**I. Deputy Zibell**

The jury found that none of defendant Zibell's three challenged uses of force -- knee strikes, taser use, and compliance hold -- constituted an unreasonable use of force. However, as noted, the jury hung as to the excessive force claim against defendant Giese, resulting in a partial verdict that Zibell asks the court to accept. While the Rules of Civil Procedure are silent on the issue of accepting partial verdicts in civil cases, the law in the Seventh Circuit is not. A trial court may exercise its sound discretion to accept a partial verdict. *Sanchez v. City of Chicago*, 880 F.3d 349, 361 (7th Cir. 2018). Of course, just because the court *may* accept a partial jury verdict, does not mean it *must*. In exercising discretion, *Sanchez* does suggest that accepting a partial jury verdict regarding one defendant may be appropriate if doing so would not risk an inconsistent verdict regarding the other defendant at retrial. 880 F.3d at 361. In other words, this court should consider whether accepting a partial verdict as to Zibell would have an effect on the jury's ability to determine whether Giese used excessive force at a retrial. *Id.*

In this case, defendants argue that because each challenged use of force was distinct, accepting a verdict in favor of Zibell would not risk an inconsistent verdict regarding Officer Giese's specific conduct at the retrial. (Def.'s Br. Supp. 12.) On the other hand, Coder argues that the resolved issues relating to Zibell are so factually interwoven with unresolved issues relating to Giese's challenged conduct that a partial verdict would lead to jury confusion, an inconsistent verdict in the retrial, and an injustice. (Pl's Br. Opp'n 12.)

To advance this argument, Coder relies heavily on a First Circuit decision in *Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013). In that case, Drumgold claimed in a

5

§ 1983 civil trial that a detective, Callahan, withheld exculpatory evidence relating to a key prosecution witness during Drumgold's criminal trial. *Drumgold v. Callahan*, 707 F.3d 28, 32 (1st Cir. 2013). The jury deliberated in two phases. In the first phase, the jury considered whether Callahan withheld exculpatory evidence relating to his providing that witness (1) housing and meals and (2) substantial amounts of money. *Id.* at 35-36. The jury found that Callahan did not provide housing and meals, but *did* provide the witness money. *Id.* at 36. In the second phase, the jury considered whether Callahan's withholding of this evidence of giving a witness money caused Drumgold's conviction, and if so, the amount of damages. *Id*. However, when the jury was unable to reach a unanimous decision, the judge declared a mistrial.

Before the retrial, Callahan moved for final judgment on the jury's liability findings, which would lock in the determination that Callahan had not provided housing and meals and preclude that issue from being revisited in the new trial. The judge declined, reasoning that a retrial limited to causation and damages questions on which the first jury hung was not feasible, since the retrial would have to revisit the questions of the impact of Callahan withholding evidence, even if what he withheld were fixed. *Id*. at 36. During the retrial, similar evidence was presented, and the judge again sent the case to the jury in two phases. *Id.* at 36-37. Just like the first time, the jury was asked whether Callahan withheld exculpatory evidence regarding the witness. *Id.* at 37. However, this time, the jury answered yes to *both* questions, not just the second, and in the second phase, the jury found causation and awarded Drumgold $14 million in damages. *Id.* at 37.

6

Callahan appealed to the First Circuit, arguing that the second jury should not have been permitted to reexamine the question of whether he withheld the housing evidence, since that question was resolved in his favor during the first trial. *Id.* at 45. The Court ruled against Callahan, concluding that to allow the retrial jury to revisit whether Callahan withheld evidence that he gave money to the witness, but not whether Callahan withheld evidence regarding the housing benefit would have risked confusion, because the evidence concerning the various benefits overlapped topically and temporally. *Id.* at 47. Even aside from *Drumgold* being nonbinding authority, there are important distinctions from the facts here.

*First*, *Drumgold* involved a different set of facts and legal issues. To begin, it involved *multiple* actions by *one* defendant -- a lone detective allegedly providing housing and meals, as well as money to one of the prosecution witnesses. In this case, at issue are multiple actions by *two* defendants, and distinct uses of force by Giese and by Zibell. The jury was hung exclusively on Giese's uses of force, but was unanimous that Zibell did *not* use excessive force. Further, *Drumgold* involved a bifurcated verdict, while here the trial was not bifurcated with separate liability, causation and damages questions for each defendant.

*Second*, while the uses of force by Zibell and Giese occurred during the same incident with Coder, some even simultaneously, the use-of-force analysis is more specific than Coder now suggests. The relevant question in considering an excessive force claim is whether the totality of the circumstances justified a *particular* use of force. *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Thus, plaintiff must identify the *specific*, unreasonable conduct that caused their injuries, not just rely on the entire interaction. *See Abdullahi v. City of Madison*,

7

423 F.3d 763, 768 (7th Cir. 2005) ("the excessive force claim is narrowly defined—it concerns only defendant[s] …. conduct during the arrest, and specifically his kneeling on [the arrestee's] back/shoulder area after he was already lying prone with his hands behind him"); *see also Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (analyzing the uses of force in three stages); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 524 (7th Cir. 2012) (analyzing each gun shot as an individual use of force); *Clarett v. Roberts*, 657 F.3d 664, 675 (7th Cir. 2011) (analyzing each taser deployment as an individual use of force). When several uses of force are challenged in a single incident, it is appropriate to "carve up the incident into segments," judging each on whether an officer's use of force was reasonable at each stage. *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994). In particular here, the original jury was plainly troubled by Giese's final use of the taser after Coder had his arms and legs strapped to the restraint chair, his torso at least partially strapped in as well, and already in a compliance hold.

In *Sanchez*, the plaintiff challenged two uses of force by two defendants – the use of force by a police officer during a traffic stop and the use of force by a jail guard. *Sanchez*, 880 F.3d at 361. The jury was able to reach a unanimous verdict as to one defendant, but was hung on the other. *Id.* at 355. The district court reasoned that the cases against the two defendants were only incidentally connected and that accepting a verdict on the claims against one would not risk an ultimately inconsistent verdict on the claim against the other. *Id.* The Seventh Circuit affirmed the award of a partial verdict, concluding that treating the two incidents at issue separately was appropriate because whether the police officer

8

used excessive force in the traffic stop had no effect on whether the jailer used excessive force later. *Id.* at 361.

Unlike *Sanchez*, the facts here concern one incident at the same location and time. Still, the two defendants' use of force was distinct enough for the jury to draw different conclusions: each use of force may be and plainly was analyzed as a distinct and separate act. This means that an action by one guard is not automatically unreasonable because another guard acted unreasonably; nor is the reverse true. Indeed, even if occurring simultaneously, that Zibell's uses of force were found reasonable by the jury does not mean that subsequent (or even preceding) uses of force by Giese were similarly justified since it is "the totality of the circumstances, not the first forcible act, that determines objective reasonableness." *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (stating it is "[n]ot so" that if the first use of a taser was reasonable, all other uses would be necessarily appropriate).

Without putting too fine a point on it, therefore, this court finds little risk of an inconsistent verdict in a retrial of Coder's claims against Giese's specific uses of force, since each is distinct enough. Specifically, while both Zibell and Giese used their tasers on Coder, Zibell did so when Coder was still being brought under control against a wall and later on the ground. In contrast, Giese used his taser later *and* in a different room when Coder was already in the restraint chair and Zibell was applying a compliance hold. A finding that Giese acted unreasonably at that point would not be inconsistent with a finding that Zibell acted reasonably when he deployed his taser earlier, *before* Coder was in the chair. There is also minimal risk that the jury would confuse Zibell's taser use and

Giese's taser use since both defendants' uses are visible on the video. Likewise, while the knee strikes present a closer question, Zibell applied knee strikes at the beginning of the tussle, while Giese applied knee strikes towards the end, well *after* Zibell had already deployed knee strikes. Each is a separate and distinct use of force.

While Coder claims that "removing" Zibell from a retrial of Giese would rob him of a comprehensive verdict that considers all the facts, it would render the jury's verdict no more incomplete than did this court's "removal" of another defendant, Papara, at summary judgment. In fact, Papara participated in the same search as Giese and Zibell, cutting Coder's underwear and pulling them from his body. (Dkt. #64.) Similarly, removing one more defendant, this time by partial verdict instead of by summary judgment, will not work an inconsistent verdict or injustice. Said another way, just because the claims against Zibell and Giese were tried together originally, does not mean that they must be resolved together. *Sanchez*, 880 F.3d at 360.

At the end of the day, juries are capable of and tasked with sorting through the evidence and following a court's instructions. *Opper v. United States*, 348 U.S. 84, 95(1954); *United States v. Hanson*, 994 F.2d 403, 408 (7th Cir. 1993). A partial retrial affords due respect to the original jury's findings. *See Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 925 (7th Cir. 2000) (overturning a jury verdict is not something that courts do lightly). Because the court finds no reason to disrupt the jury's partial verdict regarding Zibell, there is no need to address Zibell's alternative arguments for judgment as a matter of law or under qualified immunity doctrine.

**II. Deputy Giese**

As for defendants request that the court grant judgment as a matter of law to Giese under Federal Rule of Civil Procedure 50, the standard of review is basically the same as that for a motion for summary judgment: whether a reasonable jury would have a legally sufficient evidentiary basis to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). When applying this standard, the court may not weigh the evidence or make credibility determinations, but instead must draw all reasonable inferences in favor of the nonmoving party. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). More specifically, a district court may only enter judgment against a party on an issue already fully heard during trial if no reasonable jury could have a legally sufficient evidentiary basis to find for that party. *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). Moreover, when the subject is excessive force, judgment as a matter of law should be granted sparingly because the inquiry into the officer's reasonableness "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Abdullahi*, 423 F.3d at 773.

Thus, on this record, the court must deny judgment as a matter of law regarding Giese's use of knee strikes. Although the question is closer, there was enough of an evidentiary basis presented at trial for a reasonable jury to find that Giese's knee strikes -- deployed while Coder was on the ground with one arm restrained *and* just after knee strikes by Zibell -- were excessive, particularly when construing the evidence in Coder's favor. While Coder did not use the phrase "knee strike" in his direct narrative testimony, he did discuss Giese bringing him to the ground and the physical "tussling" with Giese. (Trial Tr.

84:9-19). According to Giese's testimony, this is when he "deployed a couple of knee strikes" against Coder. (*Id.* 14:3-12). Additionally, Coder was able to elicit testimony from Giese on cross-examination about the knee strikes. (*Id.* 44:3-11) ("I deployed the knee strikes once you were on the ground."). If a jury were to believe Coder that he was no longer resisting while on the ground, therefore, it could find that he used excessive force in deploying additional knee strikes. (Dkt. #64).

Similarly, the court must deny judgment as a matter of law as to Giese's later use of a taser. Defendants maintain that Giese only deployed his taser when other compliance procedures failed, and Coder continued to resist officers' efforts to restrain him. (Def.'s Br. Supp. 20.) Yet Coder testified that Giese's taser use was excessive because by then he was already secured in a restraint chair, surrounded by deputies, *and* in a compliance hold. (Pl's Br. Opp'n 17.) Indeed, all of that is largely confirmed by video. Nevertheless, defendants testified that one shoulder strap was not properly tightened on Coder, while he claims to have been compliant by that point. If a jury were to believe Coder that he was no longer resisting while in the restraint chair, and sufficiently restrained in the straps and compliance hold to no longer present a safety threat, it could reasonably find that Giese used excessive force when deploying his taser. At minimum, this is a matter for a jury to decide.

Finally, the court will not grant Giese judgment as a matter of law on qualified immunity grounds. Qualified immunity shields government officials from civil damages liability *unless* the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Reichle v. Howards*, 566 U.S. 658, 664

12

(2012); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017).  Because, as noted above, the facts surrounding Giese's uses of force are in dispute, defendants are not entitled to judgment as a matter of law.  First, as to Giese's use of knee strikes, when the facts are construed in the light most favorable to Coder -- meaning he was no longer resisting nor still grabbing for Zibell's taser -- an objectively reasonable officer would have known that continuing to knee Coder -- who by then was on the floor in a prone position and with at least one hand behind his back -- was excessive.  Second, as to Giese's use of the taser, an objectively reasonable officer would have known that tasing Coder for five seconds -- while already strapped in a restraint chair, surrounded by deputies, and with his head and jaw firmly grasped by another deputy -- was excessive.  Force must be exercised in proportion to the threat posed, *Cyrus*, 624 F.3d at 863, and viewed in light of the fact that any threat Coder continued to present had already been substantially contained.  *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012).   Accordingly, the court will deny judgment as a matter of law as to Officer Giese and direct that a scheduling conference be held to begin preparations for a new jury trial as to defendant Giese's use of force against plaintiff Coder as expeditiously as practical.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for judgment as a matter of law (Dkt. #135) is GRANTED in part as to defendant Zibell and DENIED in part as to defendant Giese.

2) A telephonic scheduling conference will be set before the Magistrate Judge for a retrial on whether defendant Giese's use of knee strikes and a taser against plaintiff Coder constituted excessive force.

Entered this 3rd day of May, 2024.

                              BY THE COURT:

                              /s/

                              _____
                              WILLIAM M. CONLEY
                              District Judge